**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony Joseph ACCARDO, Defendant-**
**Appellant.**

**No. 13257.**

United States Court of Appeals
Seventh Circuit.

Jan. 5, 1962.

Rehearing Denied En Banc
Feb. 19, 1962.

**134**

Maurice J. Walsh, Stanford Clinton, Chicago, Ill., for appellant.

T. George Gilinsky, Criminal Division, Department of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., Herbert J. Miller, Jr., Asst. Atty. Gen., Robert S. Erdahl, Beatrice Rosenberg, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before DUFFY, SCHNACKENBERG, and KILEY, Circuit Judges.

KILEY, Circuit Judge.

This is an appeal by defendant from a judgment, upon a verdict, convicting him, after a trial of nearly nine weeks, on three counts charging violations of § 7206(1) [1] of the Internal Revenue Code of 1954. He was sentenced to a total of six years in prison and fined $15,000.00.

Defendant, before 1956, reported income from gambling and undisclosed sources. In February, 1954, the District Director of Internal Revenue wrote him ordering him to maintain detailed records "from that time forward." On October 5, 1955, the Director wrote asking him to submit records to support income and deductions reported in his 1954 return. His attorney told the Director there were no records.

In 1956 defendant reported income of $42,862.25 from Premium Beer Sales, Inc. In an "addenda" he scheduled "expenses incurred in promoting beer sales and automobile expenses" to support a deduction of $515.51. In 1957 he reported income from Premium of $67,540.85 and claimed deductions of $1,726.76 for automobile expense as "agent" for Premium. In 1958 he reported income from Premium of $68,871.70 and claimed automobile expense deduction of $1,753.66 as "agent" for Premium. April 25, 1960, the January Special Grand Jury indicted him.

The indictment is in three counts,[2] each charging substantially the same violations in 1956, 1957, and 1958. In essence, it is charged that defendant stated in his income tax returns that he was employed by Premium and falsely stated that 80% of his automobile expenses were incurred by him in promoting beer sales in 1956, and 90% of that expense as "agent" for Premium in 1957 and 1958.

Defendant's motion to dismiss the indictment was denied. We see no merit in his claim that this was error. The several counts are substantially in the words of § 7206(1) and are sufficient, United States v. Foster, 7 Cir., 253 F.2d 457, 459 (1958), to tell defendant what the charges against him were, and are not duplicitous. The charges of falsehood are sufficiently broad to include

1. "§ 7206. Fraud and false statements. Any person who—(1) * * * Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

    *     *     *     *     *

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution."

2. Count I charges that defendant " * * * on or about March 20, 1957 * * * did unlawfully, wilfully and knowingly make, and subscribe a document, which contained a written declaration * * * which said defendant did not believe to be true and correct * * * that * * * Accardo * * * about March 20, 1957 made, subscribed, and filed * * * a document, to-wit, 1956 U. S. Individual Income Tax Return * * * in which * * * defendant stated in substance, that during the tax year 1956 he was employed by Premium Beer Sales * * * and paid the sum of $42,862.25, * * * that while so employed 80 percent of the automobile expenses involved in the operation of a certain Mercedes Benz automobile were incurred by him in promoting beer sales for * * * Premium * * * whereas * * * defendant then and there well knew that this statement was not true and correct in that 80 percent of the said automobile expenses were not incurred by him in promoting beer sales for Premium * * * in violation of Section 7206(1), * * * ".

charges that he did not use the automobile at all in "promoting beer sales" or as "agent" for Premium. Finally, the Special Assistants and the Special Grand Jury do not, in themselves, indicate a "crash" enforcement program criticized in United States v. Bufalino, 2 Cir., 285 F.2d 408, 419 (1960) (concurring opinion).

The next question is whether there was substantial evidence to support the verdict. The Government's theory of proof was that though defendant stated he was employed as a promoter of beer sales or as agent for premium, he did nothing to warrant the statements and that consequently he could not have used his automobile in the way he swore that he had in the return.

The Government introduced the following evidence: Although defendant had an employment contract with Premium, the latter was reimbursed by Fox Head Brewery for the contract payments to defendant. Defendant was unknown and unseen at Premium's office at any time by Premium's office supervisor of salesmen; by Fox Head salesman whose desk was at Premium and whose "contacts" were with the latter's salesmen; by Premium's bookkeeper who saw the salesmen each day; by six Premium salesmen who attended salesmen's meetings; and by two salesmen-drivers and eight Premium sub-distributors. No president of Fox Head after November 1956 nor those in charge of its production, sales or fiscal affairs had ever seen defendant. Its Illinois division manager had never seen him. There were no reports in Premium's records of sales promotion or sales by defendant. He was paid more than either the owner or president of Premium.

■ Viewed in the aspect most favorable to the Government, this evidence and reasonable inferences drawable from it give substantial support to the verdict. Neubauer v. United States, 8 Cir., 250 F.2d 838, 839 (1958). Testimony that defendant rendered no service, "did nothing" and had never "done anything" was inadmissible as invading the province of the jury.

Defendant contends the court erred in denying various motions, for mistrial and to poll the jury, based upon prejudicial newspaper publicity.

The selection of the jury began September 12, 1960. The court directed and ordered the jurors, at the end of the first day of voir dire, not to read the daily press or listen to television or radio accounts in connection with the case. That afternoon and evening, and the next morning, newspapers reported that defendant had been arrested fourteen times with "no major conviction"; that he had been found guilty of disorderly conduct; that in 1930 he was indicted for carrying concealed weapons; that in 1948 he was charged with conspiracy to defraud the Government as a result of a trip under an assumed name to visit "syndicate hoodlums" at Leavenworth. "He beat both charges * * *."

The morning of September 14 there' was a newspaper headline: "THERE'S A CAPONE ECHO AT ACCARDO TRIAL." The article compared defendant's trial with that of "Al Capone" twenty-nine years before, and said "In the villain's part this time was Chicago's jet-age Capone—stony-faced * * * Accardo, the master of muscling legitimate business." The article said the evidence that convicted Capone was "practically negligible."

On September 27 Joseph Bronge, Jr., a Government witness, testified that Accardo worked for his father as a distributor of Fox Head beer, that he knew Accardo, had visited his home; that his father was now dead; and that he had heard defendant was engaged in the sale of beer.

The next morning there were front page headlines: "MURDER VICTIM'S SON TAKES STAND AGAINST ACCARDO" and "GANGSTER UPSET BY TESTIMONY OF BRONGE." On page 14 appeared the headline: "ACCARDO JURY HEARS SON OF GANG VICTIM." The stories related that the fa-

ther of the witness appeared before the grand jury which indicted Accardo, had been indicted for perjury, and was murdered "in a West Side beer war last year"; that "the shooting was blamed on fear by hoodlums that he would tell how they forced him and other beer distributors to put them on the payroll."

■ The jury separated each night and was exposed to the prejudicial publicity. In view of that fact and of defendant's publicity value, it was essential that the judge frequently, prior to separation, call the attention of the jurors *specifically* to the possibility of newspaper accounts carrying statements of facts about the case. Coppedge v. United States, D.C.Cir., 272 F.2d 504, 507 (1959).

The judge's general admonitions at the beginning of the jury selection, his assumption of their effectiveness, and his instructions, were inadequate protection. His general inquiry during the *voir dire* examination [3] did not supply the deficiency. There is no certainty that all jurors would volunteer information about violating the admonitions or admit that they were influenced by the publicity. Coppedge v. United States, D.C.Cir., 272 F. 2d 504, 508 (1959). He should have, by the careful examination of each juror, out of the presence of the others, determined the effect of the articles on those who had read them and whether they had discussed the articles with others. Coppedge v. United States, D.C. Cir., 272 F. 2d 504, 508 (1959). These individual interviews would have tended to overcome reluctance to speak out.

The published material would have been inadmissible in evidence because it would prejudice defendant. Its effect would be at least as great if it reached the jury through news accounts. Marshall v. United States, 360 U.S. 310, 312–313, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

Each case must rest on its "special facts." Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); United States v. Shaffer, 7 Cir., 291 F.2d 689 (1961), cert. denied, 82 S.Ct. 192 (Nov. 14, 1961). In the instant case there was no careful examination of the individual jurors nor offer to defendant of unlimited peremptory challenges, as there were in the Shaffer case. And the instant case cannot be distinguished from Marshall v. United States, as Shaffer was distinguished from Marshall by this court, on the ground that in Marshall the prejudicial articles were read during the trial with no opportunity to secure other jurors. The Bronge incident was during the trial, as in Marshall.

The motions for mistrial during *voir dire* and later, and the motion to poll the jury after the Bronge incident, were addressed to the court's discretion. Marshall v. United States, 360 U.S. 310, 79 S. Ct. 1171, 3 L.Ed.2d 1250 (1959); United States v. Shaffer, 7 Cir., 291 F.2d 689 (1961), cert. denied, 82 S.Ct. 192 (Nov. 14, 1961). Under the "special facts" of this case, however, we conclude that the rulings failed to provide adequate precautionary measures in aid of defendant's right to a fair trial.

■ There was prejudicial error also in the trial court's admission, over objection, of evidence of defendant's income tax returns for the years 1940 through 1955. The court admitted the evidence to show "motive, intent or willful conduct."

No case has been cited, or found, which would support the instant ruling. Government relies upon United States v. Iacullo, 7 Cir., 226 F.2d 788 (1955), cert. denied 350 U.S. 966, 76 S.Ct. 435, 100 L. Ed. 839 (1956). That case is not applicable because there evidence of a prior similar violation was held admissible under an exception to the general rule,[4] the

---

3. "I ask each and every one of you, have you followed my direction in that regard?"

4. "As a general rule, upon the trial of an accused person, evidence of another offense, wholly independent of the one charged, is inadmissible." 226 F.2d 788, 793.

earlier transaction was "in remarkable conformity" to the pattern of the offenses charged, and there was not a jury. Here there was a jury; and most of the disputed evidence, indicating violations of Illinois anti-gambling laws,[5] showed no "remarkable conformity" to the offenses charged in the instant indictment, since it has never been claimed that the prior returns violated the law.

The Supreme Court has said that it would "expect willfulness" in felonies of this class [6] "to include some element of evil motive and want of justification * * *." Spies v. United States, 317 U. S. 492, 498, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). The Court there equated "bad faith" and "evil motive." Morissette v. United States, 342 U.S. 246, 265, 72 S.Ct. 240, 96 L.Ed. 288 (1952). And in United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) the Court said that in a criminal statute willful generally means "an act done with a bad purpose * * *; without justifiable excuse * * *; stubbornly, obstinately, perversely * * *. * * * also * * * to characterize a thing done without ground for believing it is lawful * * * or conduct marked by careless disregard whether or not one has the right so to act, * * *." It is because of this element that a defendant is entitled to produce evidence, and to an instruction, with respect to his good faith and actual belief. United States v. Murdock, 290 U.S. 389, 396, 54 S.Ct. 223, 78 L.Ed. 381 (1933).

The income tax returns were introduced, and several witnesses testified to the preparation of the returns and to conversations with defendant about the sources of his income for those years. A Government witness testified to a summary of the returns and the written summary was introduced into evidence. The effect of all this testimony was to show that defendant had an income from gambling in 1940 through 1955 of about "one million two hundred thousand dollars."

The element of willfulness or motive, in the sense of "bad faith," involved in the offense charged is in the implied charge of an affirmative deliberate claim of a business expense deduction made when defendant knew he was not lawfully entitled to the deduction. The willful, or "bad faith," element is the deliberate making of the false statement, not the making of an honest mistake of judgment. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933). The motive for the willfulness is not an element. Testimony that defendant was not employed furnishes a basis upon which the jury may draw inferences that defendant knew or ought to have known that he was not a "promoter of beer sales," or "agent," for Premium and therefore could not lawfully claim the deduction, and consequently was willful in making the false statement. So far as the offense charged is concerned, proof of an ulterior motive or intent of defendant in making the "switch" in reporting income in 1956 or in creating a "facade" [7] is not a relevant circumstance to support an inference that defendant was willful, in the sense of harboring "bad faith," in making the false statement. The disputed evidence is not admissible on authority of the illustrations given in Spies v. United States, 317 U.S. 492, 499, 63 S. Ct. 364, 87 L.Ed. 418 (1943). The Court there was discussing the willful element in a tax evasion case, and not the willful element in a charge under § 7206(1).

The impact of this testimony on the trial judge indicates the probable prejudicial impact the testimony had on the

5.  See Ill.Rev.Stat. ch. 38 §§ 324–327, 336, 341–343 (1959).

6.  Violations of § 7201 Internal Revenue Code of 1954.

7.  The Government presented the evidence to show that defendant made the alleged false statment as part of a facade behind which (in 1956) he made a switch to falsely reporting employment income from Premium instead of reporting gambling income from undisclosed sources.

jury. In denying the defendant's motion for a new trial, the trial court said:

"I don't know how a defendant could have been engaged in that kind of enterprise, it would seem to me, without relying on the connivance of certain public officials. That is not in evidence, but I think that a reasonable inference from the record in this case. * * * I think the only conclusion one can draw from the huge amounts of income reported by the defendant and as revealed from the evidence is that this is a malignancy, this professional gambling, which has penetrated all levels of our society, and that it is a national calamity."

We conclude that the highly prejudicial evidence was not relevant and was inadmissible, that the court had no discretion to admit it, and that the careful instruction with respect to the evidence could not cure the error because the evidence should not have been admitted.

■ The trial court erred also in precluding defendant from introducing his copies—Copies C—of the W–2 forms filed with his return for the three years in the indictment. Copies B of these forms, which had been attached to the returns filed by defendant and wife, were detached from the returns before the latter were submitted to the grand jury. The defendant was entitled, on the employment issue, to have the jury see his copies of the W–2 form. The counterparts of these—Copies D—were part of Premium's income tax returns, and accordingly were statements, of wages paid defendant, made under penalty of perjury by Premium, relevant to the defense. Defendant's right was not fully served by having the jury get the information by looking at his statement in his income tax return, or by testimony given with respect to the forms by Premium's bookkeeper. Their statements would probably not have the same effect in proof of his employment as the copy of the sworn statement of Premium.

■ There was another erroneous ruling. The prosecution witness Cutinelli testified that in the latter part of 1958 he was interviewed by Government agent Butkovich on three occasions and his remarks were reduced to writing on these occasions. He saw two of the statements and signed them after they were read to him. One statement was turned over to defense counsel. The second one was submitted to the court *in camera*. The Government denied it had a third statement. Defendant moved for its production under § 3500.[8] Government said it searched and could find none. A similar occurrence took place in connection with the Government witness Smetana. The court declined to permit defendant to prove that the statements not found by the Government were in existence. This was error, Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), and the ruling as to relevancy should not have been based, even in part, on statements of Government counsel.[9] Section 3500 is construed by the Supreme Court to require the judge to make the determination. Scales v. United States, 367 U.S. 203, 258, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Palermo v. United States, 360

8. 18 U.S.C. § 3500. "Demands for production of statements and reports of witnesses

    *    *    *    *    *

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents * * * relate to the subject matter * * * the court shall order it to be delivered directly to the defendant for his examination and use."

9. 18 U.S.C. § 3500(c) "If the United States claims that any statement ordered to be produced * * * contains matter which does not relate to the subject matter of the testimony * * * the court shall order the United States to deliver such statement for the inspection of the court in camera. * * *"

U.S. 343, 361, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959) (concurring opinion).

No error is found by this court on other points raised by defendant but not discussed in this opinion.

For prejudicial error at the trial, the judgment is reversed and the cause remanded for new trial, consistent with the rules announced in this opinion.

DUFFY, Circuit Judge (concurring). ██ I agree with Judge KILEY that if the trial of this case were free from prejudicial error, the evidence viewed most favorably to the Government would support the verdict and judgment. I also agree the indictment was sufficient on defendant's motion to dismiss. However, a careful study of the record convinces me that prejudicial errors were committed, and that there is no escape from the conclusion that a new trial must be ordered.

It is well to bear in mind that this is not a tax evasion case. The indictment charged violations of Title 26, § 7206(1), the so-called False Statement statute. Taxpayer reported income from Premium Beer Sales, Inc. of $42,862.25 for 1956; $67,540.85 for 1957 and $68,871.70 for 1958, and paid income taxes on the basis of these receipts. However, he claimed a deduction of $515.51 in 1956, $1726.76 in 1957 and $1753.66 in 1958 as a portion of his automobile expenses while acting as agent for Premium. It is the Government's claim that taxpayer was not employed by Premium, hence the statements in defendant's tax returns as to the relatively small deductions, were false.

██ For some years past, defendant has received wide publicity in the press in the Chicago area, and elsewhere, as the reputed leader of an organization or group sometimes known as the Syndicate, said to be of great influence and controlled or run by hoodlum interests. When the instant charges were brought,

all newspapers and other news media in the Chicago area gave wide publicity to the charges against defendant and the impending trial. At each step of the proceedings, the public was given vivid accounts, often mentioning defendant's reputed background. The sentational nature of the news stories made it extremely difficult for the defendant to have a fair trial in the Chicago area, unless the jury were sequestered.

Pertinent is the statement of Mr. Justice Douglas,[1] "A defendant, however, is on trial for a specific crime, and is not to be condemned, imprisoned, or executed for what laymen would call his bad character or reputation. See Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168. * * * At other times the papers may so beat the drums of prejudice and passion as to make it doubtful whether a trial in the local courthouse can be fair to a particular defendant. * * * The point is that our remedy for excessive comment by the press is not the punishment of editors, but the granting of new trials, changes in venue, or continuances to parties who are prejudiced." Here, defendant did not ask for a change of venue. However, requests for continuances based upon illness of principal counsel, were denied.

The trial of this case extended over eight weeks. On the first day of the trial, on the *voir dire,* the District Court did admonish the prospective jurymen not to read about the trial in the newspapers or listen to the radio or TV accounts of the trial. However, the sensational headlines continued throughout the eight weeks, and although the District Judge frequently was requested by defendant's counsel to question the jury as to whether these accounts had come to the attention of any of the jurors, he refused to do so; nor did he give any further cautionary instructions.[2]

---

1. "The Public Trial and the Free Press." 46 A.B.A. Journal, p. 841.

2. In his final instructions to the jury, the trial judge did recall the admonition he had given more than eight weeks previously about reading press accounts of the trial. As the jury, at that time, was about to be locked up in the jury room, the admonition would seem to be a bit late.

The jury separated each night. One would have to be naive indeed to think that even a well-intentioned juror could escape the bombardment of flaming headlines in newspapers and the sensational reporting of the trial on TV and radio. Although I do not say it was the trial judge's duty to examine jurors separately each time a motion was made by defendant's counsel, I believe that as a minimum, the trial judge should have frequently repeated the admonition given on the first day of the trial. Under somewhat similar circumstances, some trial judges have adopted the practice of giving such an admonition at the close of each day's session of a trial. This is a good practice. To do so would not consume more than thirty seconds each time it was given.

The dissenting opinion argues there is no affirmative proof in this case that any juror read any newspaper account of the trial or listened to radio or TV accounts thereof. However, counsel for defendant took the only course open to them in moving that the trial judge ascertain whether any juror had read or heard such accounts. When the judge declined to act, there was nothing further that defense counsel could do in that respect.

Newspapers may properly print information which jurors, in a particular case, should not know. Rules of evidence are designed to protect an accused from prejudice. Testimony which a judge would not receive in evidence should not come to the jurors' attention by means of press, radio or TV. I hope we have not reached the point in the trial of criminal cases in this country when jurors will decide the innocence or guilt of a defendant on information other than that received in the usual and proper manner from the witness stand. Where jurors are permitted to separate each night during a trial, which is usually the case, and where public sentiment has been aroused by sensational news stories often containing information which could not be received in evidence at the trial, the trial judge has a heavy duty to do everything in his power to assure a fair trial to the defendant.

The trial court erred in permitting the Government to introduce defendant's tax returns without the W-2 forms being attached, and by preventing defendant from introducing his duplicate copies of such forms. These forms are statements by the employer showing the Social Security number of the employee, the total wages paid to the employee, and the total amount deducted and withheld as income tax. Any employer furnishing a false statement is subject, by federal statute, to fine and imprisonment. A duplicate copy must be furnished to the employee.

As defendant was charged with making false statements in his income tax returns, he was entitled to have those returns received in evidence in the same condition as they were when he executed and filed same. If the Government's employees had detached and destroyed those W-2 forms, the Court should have permitted the duplicates thereof to be received in evidence.

I do not understand the statement in the dissenting opinion that the W-2 forms would have been merely cumulative evidence. The principal and controlling question in the case at bar is whether defendant had been an employee of Premium during the years in question. The defendant had the right to bring in all available pertinent evidence to prove his contention. The W-2 forms had been executed by Premium under a statute providing a penalty for making a false statement, and they designated defendant as an employee of Premium. Apparently the forms were executed prior to any date when the Government had raised any question as to the validity of the claimed employment. If, in fact, the original forms had been destroyed, the duplicates should have been received in evidence. In my view, there was no justification for excluding such evidence because it was "cumulative" or for any other reason.

I fully agree with Judge KILEY that the admission of defendant's federal

income tax returns from 1940 through 1955 was prejudicial error. The returns and testimony with reference to same, disclosed a total income of about $1,200,-000 for those years received principally from gambling and upon which income taxes of nearly a half million dollars had been paid. There was no evidence in this case of gambling income received by defendant since 1955. The stated reason for their admission was motive.

The Government prosecutors said they would not seek to make use of the sixteen tax returns which antedated the charges in the indictment until they had "presented completely our evidence of falsity in the returns." Before any such proof was presented, the trial judge admitted the returns into evidence and copies of the 1940–1955 returns were promptly turned over to newspaper reporters, apparently by the prosecutors. Upon objections by the defendant, the trial judge stated he could not impound evidence that had been received.

Of course, the evidence of another offense wholly independent of the one charged, is inadmissible. This was not a tax evasion case. No claim was made in this case that the former returns violated the law. The apparent purpose of the Government was to show that over a period of many years, defendant was a big-time gambler. The manner in which the 1940–1955 income tax returns was handled, in my opinion, was prejudicial to the right of the defendant to have a fair trial on the charges which were then before the Court.

Defendant's counsel demanded the production of statements in the hands of the Government in order that they might be examined under the terms of the Jencks Act, 18 U.S.C. § 3500. Some of these were examined by the trial judge *in camera*. Defendant claims that in each such case, the Judge adopted completely the deletions suggested by Government counsel. I express no opinion on that point. However, the Judge did not examine *in camera* some of the other statements withheld by the Government. He accepted the representations of Government counsel that the statement did not come within the Jencks Act. No matter how great was the Judge's confidence in the statements of Government's counsel, it was the Judge's responsibility to make the examination himself. It was his non-delegable duty to do so.

Having reached the conclusion that defendant did not have a fair trial, I concur in the judgment ordering a new trial. My feeling is well expressed in the statement in the concurring opinion of Judge Clark in United States v. Bufalino, 2 Cir., 285 F.2d 408, 420, "For in America we still respect the dignity of the individual, and even an unsavory character is not to be imprisoned except on definite proof of specific crime."

SCHNACKENBERG, Circuit Judge (dissenting).

1. In the majority opinion, the court states defendant's contention that " * * the court erred in denying various motions, for mistrial and to poll the jury, based upon prejudicial newspaper publicity." Following its discussion of this contention, the court concludes:

> "The motions for mistrial during *void dire* and later, and the motion to poll the jury after the Bronge incident, were addressed to the court's discretion. * * * Under the 'special facts' of this case, however, we conclude that the rulings failed to provide adequate precautionary measures in aid of defendant's right to a fair trial."

Inasmuch as the court does not hold nor even discuss an abuse of discretion by the district court, it would seem that this court's conclusion from the "special facts" is irrelevant.

If, however, this court, is going to review the relevant rulings of the district court on the subject of newspaper publicity, absent a finding of abuse of discretion by that court, the following remarks are directed to that purpose.

2. Defendant had a constitutional right to a fair trial. That trial was, of course, not to be conducted in a vacuum

in society. It was to be conducted in an environment embracing certain immutable circumstances. It was to be held in a community where there was a free press, which published newspapers for the benefit of the community and the country which recognizes and guarantees the constitutional rights of both the defendant on trial and the press.

Obviously the owner of a newspaper does not create news; it gathers and publishes news. Some persons are more newsworthy than others, dependent upon their activities in life.[1] Therefore a metropolitan newspaper would be expected to give little or no attention in its news columns to a court trial of an obscure citizen, who, by his past life and the litigation in which he is engaged, is not newsworthy, while just the opposite result might occur if the circumstances were to the contrary. We gather from the record before us that defendant, based upon his prior experiences, was considered by the Chicago newspapers to be newsworthy. It follows that the newspapers had a right to publish as news any facts pertaining to him, subject to legal redress in libel actions for any abuse in that regard.

Another immutable fact is that a court has a right to conduct a public trial of a criminal case in the community where the defendant resides, even though the public character of the trial makes the proceedings therein accessible and subject to report and comment in newspapers, and over the television and radio.[2]

It is the duty of the trial court under such circumstances to proceed with the trial, and to take proper steps to the end that the activities of news media do not interfere with defendant's receiving a fair trial. The question before us is whether the district court performed its duty properly in this respect in this case.

The jurors who heard this case were selected through a screening process which lawyers call the voir dire examination, extending over a period of three days, during which the judge twice ordered them not to read any newspaper, or listen to radio or television, reference to the trial. Indeed, as prospective jurors were being interrogated about reading newspaper articles mentioning defendant, one remarked that the judge had asked them not to read newspapers.

On September 13, 1960, during the voir dire examination, defendant made a motion for a mistrial based on newspaper articles of September 12 and 13, because of "adverse publicity * * * in the Chicago daily newspapers * * *".

A similar motion was made on the following day when, at the suggestion of defense counsel, the court referred to the fact that he had ordered the jurors not to read the newspapers and that he assumed that the prospective jurors had followed his direction. The court thereupon asked of the jurors:

"I ask each and every one of you, have you followed my direction in that regard?"

A Mrs. Langfeld answered that, while riding on a train, she saw a headline (evidently referring to defendant) on a newspaper held by another passenger. Responding to the court's inquiry as to whether she could still give defendant a fair and impartial trial and consider the case only on the evidence and the law, the juror answered in the affirmative.

No other juror stated that any newspaper reference to defendant had been seen.

Defendant's renewed motion for a mistrial was denied.

In his final instructions, the court impressed upon the jury again what he had already orally instructed them during the trial about their duty not to read newspaper articles or listen to anything said

1. Judge KILEY recognizes that defendant had "publicity value."

2. It is significant that defendant's counsel made no motion for a change of venue on the ground of pretrial publicity in regard to defendant. Stroble v. California, 343 U.S. 181–194, 72 S.Ct. 599, 96 L. Ed. 872.

over the radio or television about the case.[3]

Mr. Justice Holmes long ago noted in Holt v. United States, 218 U.S. 245, at 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021:

"* * * If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trials under the conditions of the present day. * * * *"

We said, in United States v. Sorcey, 7 Cir., 151 F.2d 899, 903, certiorari denied, 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021:

"* * * we must not permit the integrity of the jury to be assailed by mere suspicion and surmise; it is presumed that the jury will be true to their oath and conscientiously observe the instructions of the court, * * *."

In Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278, the court said:

"* * * Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice."

In Opper v. United States, 348 U.S. 84, at 95, 75 S.Ct. 158, 165, 99 L.Ed. 101, the court said:

"* * * Our theory of trial relies upon the ability of a jury to follow instructions. * * *"

We cannot ignore the admonitions of these cases and seize upon suspicion and surmise or the mere opportunity for prejudice as a basis for overturning the verdict of a jury, whose members swore to try the case according to the law and the evidence, and who were selected by counsel for both sides after a three-day voir dire examination. The weakness of defendant's attack upon this verdict is underscored by its ill-advised reliance on Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, where there was no preliminary admonition to jurors not to read the newspapers, and, during the trial, *two newspapers got before a substantial number of the jurors.* One reported that defendant had a record of two previous felony convictions, and that he admitted practicing medicine with a $25 diploma he received through the mail. The other reported that he acted as a physician and prescribed restricted drugs, and that he once served a term in the Oklahoma penitentiary for forgery. As the Supreme Court pointed out in Marshall, at 312, 79 S.Ct. at 1173:

"* * * *We have here the exposure of jurors to information* of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. * * *" (Italics supplied.)

In the case at bar the contrasting fact is that there is no affirmative evidence that any juror was exposed to any of the alleged prejudicial newspaper publicity. We have no right to find such exposure in the face of the admonitions of the court and our judicially well-grounded unwillingness to impeach the integrity of the members of a jury by mere suspicion and surmise.

Judge KILEY has cited three times Coppedge v. United States, 272 F.2d 504, a 1959 decision by the Court of Appeals

---

3. "Members of the jury, you will recall at the beginning of this trial I instructed and ordered you to refrain from talking with anybody about this case. I also instructed you not to permit anyone to speak with you about it. I also directed and ordered you not to read any articles about the case that might be printed in the newspapers concerning it, and from listening to anything that might be said over the radio or television about it. I assume that as jurors you have complied with the orders of the Court in this regard."

of the District of Columbia. He comes to the conclusion therefrom that in the case at bar the trial judge "should have, by the careful examination of each juror, out of the presence of the others, determined the effect of the articles on those who had read them and whether they had discussed the articles with others." However, there was a clear factual basis in Coppedge to distinguish it from the case at bar. In that case between the third day of the trial and the beginning of the fourth day thereof, two Washington newspapers published accounts of the trial, including statements made in court, out of the presence of the jury, to the effect that one Clarence Thompkins, a prosecution witness, was distinctly afraid of defendant and refused to testify against him, and that Thompkins saw defendant unmercifully beat, pistol whip and knock the teeth out of Thompkins' brother. The prosecutor told the court that he thought Thompkins had a reasonable basis for his fear because defendant was a very vicious criminal.

Before the trial resumed, one newspaper account said that defendant was serving a prison term for assault with a deadly weapon on Thompkins' brother.

When the trial resumed, defense counsel moved for a mistrial, presenting these articles to the court and requesting the court to interrogate the jurors. The court then asked the members of the jury whether any of them had read either of the articles. *Four of the regular jurors and one of the alternate jurors raised their hands.* The court then told the jury that the articles must not affect their decision and asked if any who had raised his hand thought that he could not bring in a verdict after considering only the evidence and the court's instructions. No juror indicated by raising of hand that he could not bring in such a verdict.

The court then denied the motion for a mistrial. However, the reviewing court pointed out "prior to the foregoing occurrences the court had not admonished the jurors against reading newspaper articles or listening to broadcast accounts

relating to the trial." It mentioned that the admonition of the trial court to the jury that they not discuss the case with anyone and to keep an open mind did not mention newspaper or newspaper articles.

The court of appeals also noted that the trial court made no reference to the matter in his final instructions to the jury.

It held that the inquiry made of the jurors by the court concerning their reading of the newspaper articles was not adequate for the protection of the defendant and significantly said that the court knew which of the regular jurors had read the newspaper articles, but no individual inquiry was addressed *to these persons* as to the possible influence of the article upon each of them. There was no admonition that jurors who had read the articles must not reveal their purport to the remaining jurors. The reviewing court concluded its reasoning upon this point by saying, 272 F.2d at 508,

"* * * In view of the nature of the articles the court should have made a careful, individual examination of *each of the jurors involved,* out of the presence of the remaining jurors, as to the possible effect of the articles." (Italics supplied.)

With the soundness of that holding we have no disagreement, but the court there was confronted with facts fundamentally opposite to those before us in this case. There four jurors admitted that they had read the prejudicial newspaper articles. Here there is no proof, and no contention that there is any proof, that any of the jurors read any of the alleged prejudicial newspaper articles. On the facts the two cases are as different as black and white. Hence the use of Coppedge as authority for the statement that the trial judge in the case at bar should have carefully examined "each juror, out of the presence of the others", to say the least, is baseless. Further, the suggestion that such individual interviews would have tended to overcome reluctance to speak out implies a belief in the existence of an unusual shyness or an actual feeling of

guilt on the part of the jurors in this case, when nothing indicates anything but that they were performing their duties with a feeling of responsibility and pride as American citizens.

3. In proving its case, the government introduced defendant's income tax returns for the years immediately preceding the taxable years involved in the indictment, that is to say for 1940 through 1955, and a summary thereof, showing that for those years he reported a total income of $1,155,584.17 from sources identified only as "miscellaneous" or "various", or from sources identified by name which were shown to be proceeds from gambling. The returns showed other income from identified sources amounting to $14,200.

Testimony introduced tended to show that in 1949 agent Ned Klein interviewed defendant, his attorney Eugene Bernstein and one Guzik, in the attorney's office, and that Guzik told the agent that the income reported under the heading "Guzik and Accardo" in the 1946 return and as "Miscellaneous" in the 1947 return was money won on wagers in sporting events and that there were no records of these transactions.

Agent Arthur W. Hill testified that in 1959 he interviewed attorney Bernstein in reference to an item of $20,000 in reported income on defendant's 1953 return and was told that there was no record thereof and that said return was filed prior to the time that notification to keep adequate records was received, as noted below.

In February 1954, defendant was notified by a registered mail letter that a determination had been made by the Internal Revenue Service that such records as the taxpayer kept had been deemed inadequate by the Service and that the taxpayer was required to keep detailed records of gross amounts received, dates, nature of the transactions and similar details as to deductions.

On October 5, 1955, by letter defendant was requested to give to the district director of internal revenue records supporting the items of income and deductions reported in defendant's 1954 return. Attorney Bernstein then gave the agent a document purporting to show that such an item, as reflected in the summary aforesaid, of "Misc. Income * * * 20,000.00", represented horserace winnings.

The government's theory was that defendant's purported employment by Premium was in name only and hence that the deductions claimed for automobile business expenses for 1956, 1957 and 1958 were false; and that defendant thus sought to convey to the Internal Revenue Service the false impression that he was devoting his time and effort to the sale and promotion of beer products, and by this means to interfere with the Service's investigation and determination of his true tax liability. According to the government's theory, the motive for defendant's falsification was to establish records to support income and deductions appearing on his 1954 income tax return, as requested by the Service on October 5, 1955.

The evidence offered by the government and admitted, as above referred to, was clearly relevant and no error occurred in that respect. Nothing was said in Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, which is inconsistent with the admission of this evidence. In fact, its language clearly supports an affirmance herein. For instance, the court said, at 499, 63 S.Ct. at 368:

"* * * we would think affirmative willful attempt may be inferred from conduct such as * * * covering up sources of income, * * * and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime."

Judge KILEY recognizes the distinction between the willfulness or bad faith element involved in the deliberate making of a false statement and the making

of an honest mistake of judgment. The law entrusted to the jury the function of deciding which factor motivated defendant. This was a question of fact. The answer is evident in the verdict, which was approved by the district court.

4. The failure of the government to produce at the trial copies of the W-2 forms which had been attached to defendant's returns filed for the years in question is not ground for setting aside the verdict and reversing the judgment below. Evidence showed that, according to government procedure, the W-2 form is removed from the return during the initial processing and forwarded to a processing center in Kansas City, Missouri, where, after a period of time, it is destroyed. The W-2 forms for the years in question would have been destroyed by the time of the trial below. Whether these forms were physically present at the trial is immaterial, because of the fact that they originally accompanied the returns and there was proof at the trial that they reflected the amount of money paid each year to defendant and the amount deducted therefrom for withholding and social security taxes. If they could have been, and were, produced at the trial, their purpose would have been the same as other evidence introduced by the defense for the purpose of proving the contention that defendant was employed as a salesman by Premium Beer Sales. As such it would have been merely cumulative.

The full significance of the missing W-2 forms was established before the jury by other testimony, including that of Marguerite Mahoney, Premium's bookkeeper, who actually prepared these forms for defendant. In the course of her testimony she said, in effect, that she did not know of any services he performed for Premium.

For the same reasons, the court did not err in refusing to receive in evidence defendant's copies of these W-2 forms.

5. For the purpose of proving that defendant rendered no sales or promotional services to Premium, the government produced numerous witnesses who, according to the evidence submitted, were in positions to have known if such services had been rendered. They testified to the effect that they knew of none. Numerically they consisted of twenty-five persons, according to the government, or twenty-two persons, according to the defense.

Two of these witnesses were Cutinelli and Smetana. Judge KILEY relies upon the action of the district court in not granting a motion of defense counsel for the production of an alleged statement by Cutinelli and in refusing to permit defendant to prove that two alleged statements (one by Cutinelli and one by Smetana), not found by the government, were really in existence. He cites 18 U.S.C.A. § 3500 (b) and (c).[4]

Even if it be admitted *arguendo* that the Cutinelli and Smetana oral testimony was inadmissible, the error in admitting that evidence was harmless because the fact intended to be proved thereby has been fully shown by other evidence, overwhelming in its nature, which is admittedly competent. This principle is well-established. 24 C.J.S. Criminal Law § 1915(c).

For these reasons, I would affirm the judgment of the district court.

4. Examination of the trial court transcript reveals that that court painstakingly investigated and made a ruling upon these points and that not less than 33 pages of proceedings are devoted to this matter of Cutinelli and Smetana.