UNITED STATES of America,
Plaintiff-Appellee,

v.

Nick PALERMO, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph AMABILE, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Henry Ed NERI, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Leo SHABABY, Defendant-Appellant.

Nos. 16593, 16595, 16596 and 16677.

United States Court of Appeals
Seventh Circuit.

April 3, 1969.

Rehearing Denied and Rehearing En
Banc Denied June 16, 1969.

Charles A. Bellows, Chicago, Ill., for Joseph Amabile; Bellows, Bellows & Magidson, Chicago, Ill., of counsel.

Maurice J. Walsh, Carl M. Walsh, Chicago, Ill., for Henry Ed Neri.

Thomas Ramsey, Chicago, Ill., for Leo Shababy.

Thomas A. Foran, U. S. Atty., John L. Conlon, Asst. U. S. Atty., Chicago, Ill., for appellee; John Peter Lulinski, Gerald M. Werksman, Sheldon Davidson, Asst. U. S. Attys., of counsel.

Before SCHNACKENBERG,* CUMMINGS and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Defendants were indicted for conspiring to violate the Hobbs Act, 18 U.S.C. § 1951, by interfering with commerce by extorting money from a builder and in so doing, interfering with interstate shipments of construction materials. The jury found all defendants guilty and from these convictions they appeal.

From 1962 to 1965 Riley Management Company, with William G. Riley as president, was building various apartment building complexes in suburbs surrounding Chicago. Melrose Park Plumbing was a subcontractor on Riley's first construction project in Addison, Illinois, in 1962. Nick Palermo, a defendant and the owner of Melrose Park Plumbing, wanted to be sure that Riley would use his company on all of Riley's building projects. To accomplish this, Palermo and defendant Joseph Amabile, also known as Joe Shine, conspired together with others to force Riley into using Melrose Park Plumbing as a subcontractor and at the same time having Riley pay them extra money for their work. See United States v. Battaglia, 394 F.2d 304 (7th Cir. 1968). In essence, Amabile, Palermo and others agreed to obtain as much money as possible from Riley by threatening him with work stoppages and physical violence.

John Powers Crowley, Chicago, Ill., for Nick Palermo.

---

* Judge Schnackenberg participated in the hearing of oral argument and the conference of the judges above named. He died prior to the issuance of this opinion.

Early in 1962, Riley became interested in building another apartment complex in Northlake, Illinois. In April of 1962, defendant Henry Ed Neri, Mayor of Northlake, and Wayne Seidler, an un-indicted co-conspirator, met with Riley's attorney at which time Mayor Neri told him it would cost $100 per unit or $70,-000 in order to build the project in Northlake. Without this money, re-quired zoning changes would not be made nor would building permits be is-sued. A few days later Amabile told Neri that he and Nick Palermo were taking over the project in Northlake and could obtain at least $40,000 for Neri's people. Neri then asked Amabile for $10,000 before the next meeting of the Zoning Board.

Defendants Leo Shababy and Joseph Drozd[1] were aldermen in Northlake. They and some members of the Zoning Board received various monies from Amabile for rezoning the area. When the money demanded was not being paid on time, Shababy, Drozd, Seidler and Neri put pressures on Amabile includ-ing withholding approval of the zoning change and refusing to issue building permits. In turn, Amabile and Palermo pressured Riley into paying them $64,-000 by threatening him both with work stoppage at the Addison project and physical violence to himself and his family. Riley testified that Palermo hit him in the face and threatened to make him understand with a baseball bat. See United States v. Battaglia, 394 F.2d 304, 308 (7th Cir. 1968).

## DOUBLE JEOPARDY AS TO AMABILE

Prior to this finding of guilty, Joseph Amabile was convicted under an indict-ment for conspiring to extort $48,500 from Riley Management Company dur-ing the years 1964 and 1965 in viola-tion of the Hobbs Act, 18 U.S.C. § 1951. United States v. Amabile, 395 F.2d 47 (7th Cir. 1968). Amabile claims that he was part of one overall conspiracy to extort money from Riley and that to be convicted twice for the same crime vio-lates his fifth amendment protection against double jeopardy.

■ Since "Agreement is the pri-mary element of a conspiracy," United States v. Varelli, 407 F.2d 735, p. 741 (7th Cir. 1969), the question is what is the nature of the agreement between the conspirators. The government is not free to arbitrarily decide whether there is one agreement or several. If the agreement

> * * * contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of nat-ural thought and of natural language to call such continuous co-operation a cinematographic series of distinct con-spiracies, rather than to call it a single one.

United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910). To convict a party severally for being part of two conspiracies when in reality he is only involved in one overall con-spiracy would be convicting him of the same crime twice. Short v. United States, 91 F.2d 614 (4th Cir. 1937); United States v. American Honda Motor Company, 271 F.Supp. 979 (N.D.Calif. 1967).

■ The overall agreement here was different from the separate agreements in United States v. Varelli, 407 F.2d 735 (7th Cir. 1969), where the Polaroid hi-jacking was completely separate from the silver hijackings. Here, there was one overall agreement to extort money from Riley in any way possible while in *Varelli* there was no proof of one agreement to hijack several shipments. Each building project in which money was extorted from Riley did not involve separate conspiracies. Rather, once Palermo and Melrose Park Plumbing had obtained a position of leverage over

---

1. Joseph Drozd did not appeal from his conviction.

Riley, Amabile and Palermo agreed with others to use this leverage to extort money from Riley on all future projects. Although the methods of obtaining money from Riley on the various projects may have been different, the overall objective was the same. The situation here is dissimilar to that in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where the court found that "each separate agreement had its own distinct, illegal end." Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947). Even though the incidents occurred over a period of years, the overall agreement constituted a continuing conspiracy against Riley. United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124 (1910).

Since Amabile has already been tried and convicted of conspiring to extort money from Riley, Amabile's fifth amendment rights were violated by placing him in jeopardy twice for the same criminal act. If Amabile had been convicted in both cases of substantive violations of Section 1951, he would have been found guilty of two criminal acts and the double jeopardy problem would not be present. Therefore, on remand the district court must dismiss this indictment as to Amabile.

## PREJUDICIAL PUBLICITY

Various articles published during the trial were prejudicial to the defendants. Included among the prejudicial articles was one which reported that defendants Amabile and Palermo were called to the witness stand outside the presence of the jury by counsel for defendant Neri and claimed their fifth amendment privilege against self-incrimination in answering all questions.[2]

The trial judge was careful in admonishing the jury every day not to read any newspapers or listen to any news accounts. While he was requested to ask the jury, either as a whole or individually, whether they had read or heard any publicity, he refused because the defendants had opposed the government's motion to sequester the jury. United States v. Accardo, 298 F.2d 133 (7th Cir. 1962), and Margoles v. United States, 407 F.2d 727 (7th Cir. 1969), hold that at a minimum, the trial judge must question the jury as a whole when prejudicial publicity is brought to his attention.[3] See also United States v. Rizzo, 409 F.2d 400 (7th Cir. 1969). Warning the jury without questioning them is insufficient.

Opposition to sequestration of the jury is based on many factors and its validity is questioned by many, especially where the trial may run for a long period of time. A.B.A. Standards Relating to Fair Trial and Free Press, Tentative Draft, Nov. 1966, Appendix C, Questionnaire for Defense Counsel, Q. 7. United States v. Battaglia, 394 F.2d 304 (7th Cir. 1968), does not hold that successful opposition to sequestration of the jury constitutes a waiver to object to all prejudicial publicity. In Battaglia, "the jurors were twice asked whether they had seen articles about the case. None admitted having done so." Id. at 317. The Supreme Court in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), ordered a new trial under its supervisory powers

2. The trial judge was requested by defense counsel to order the public media not to disclose such incident but he refused.

3. Judge Kiley in United States v. Accardo, 298 F.2d 133 (7th Cir. 1962), states that the trial judge must question the jurors individually. Id. at 136. Judge Duffy in his concurring opinion does not adopt the Kiley view but impliedly would require the judge to make inquiry of the jury as a whole:

The dissenting opinion argues there is no affirmative proof in this case that any juror read any newspaper account of the trial or listened to radio or TV accounts thereof. However, counsel for defendant took the only course open to them in moving that the trial judge ascertain whether any juror had read or heard such accounts. When the judge declined to act, there was nothing further that defense counsel could do in that respect. Id. at 140.

because the jurors admitted reading articles containing evidence not admitted at trial. Without questioning the jurors at all, it is impossible to tell whether or not they have read or heard any prejudicial publicity.

Under our supervisory power, we find it necessary to remand the case for a new trial in which the district judge should not consider opposition to sequestration of the jury as constituting a waiver of the right to question the jury as to prejudicial publicity.

## CROSS-EXAMINATION

Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), and Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), require reversal where the district judge refuses to allow questions as to a witness' address and present employment since they are threshold questions of cross-examination. "The purpose of the inquiry is to make known to the jury the setting in which to judge the character, veracity or bias of the witness. * * * Since there is no requirement of materiality, it is not necessary to show the possibility of the witness being in custody in order to make such inquiry." United States v. Varelli, 407 F.2d 735, p. 749 (7th Cir. 1969).

However, the decision to disclose a witness' address or place of employment cannot be made in a vacuum. This Court is not unaware of the problem that the government has in obtaining witnesses in cases where a witness' life may be in jeopardy if he testifies. As Justice White said in his concurrence in Smith v. Illinois, 390 U.S. 129, 133–134, 88 S.Ct. 748, 751 (1968), "In Alford v. United States, 282 U.S. 687, 694, 51 S. Ct. 218, 220, 75 L.Ed. 624 (1931), the Court recognized that questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination. I would place in the same category those inquiries which tend to endanger the personal safety of the witness."

This Court agrees with Justice White that where there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute. United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). However, the threat to the witness must be actual and not a result of conjecture. Shaw v. Illinois, 394 U.S. 214, 89 S.Ct. 1016, 22 L.Ed.2d 211 (1969). The government bears the burden of proving to the district judge the existence of such a threat.

An actual threat being shown, the government must also disclose to the district judge *in camera* the relevant information. United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). Knowing of the existence of an actual threat and the witness' location, the district judge must determine whether the information must be disclosed in order not to deny effective cross-examination. "The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling." (White, J. concurring) Smith v. Illinois, 390 U.S. 129, 134, 88 S.Ct. 751 (1968). Such decision is reviewable on appeal. Under almost all circumstances, the true name of the witness must be disclosed. Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748 (1968). If the witness is located in a penal institution, this, too, must be disclosed. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218 (1931). A witness' prior address must also be disclosed if the witness does not intend to return to this location. United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). If the trial judge concludes that the defendant does not have a right to the exact address of the witness and his place of employment, the defendant is entitled to ask any other relevant questions which may aid the jury in weighing the witness' credibility.

Here, the trial judge, having been requested to order Seidler and Riley to disclose their addresses and present employment, refused to order them to an-

swer. While there was an adequate showing of a threat to the life of Riley, there was no showing as to Seidler. In neither case was the relevant information disclosed to the trial judge in order that he could make an informed decision. On remand the government must comply with the standards set out above.

Remanded with directions.