UNITED STATES of America,
Plaintiff-Appellee,

v.

James Y. CARTER, Defendant-Appellant.

No. 79–1056.

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1979.

Decided Aug. 7, 1979.

Rehearing and Rehearing En Banc
Denied Sept. 26, 1979.

Gerald M. Werksman, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Richard N. Cox, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

CUMMINGS, Circuit Judge.

Defendant was for over fifteen years the Public Vehicle License Commissioner (Taxicab Commissioner) for the City of Chicago. On November 21, 1978, he was convicted of nine counts of a 13-count indictment charging him with racketeering activity (18 U.S.C. § 1962), violating the Hobbs Act (18 U.S.C. § 1951) and failure to report income for tax purposes (26 U.S.C. § 7206(1)). The charges were based on defendant's extortion of money from owners of independent cabs in exchange for the necessary transfer of licenses and other favorable treatment.

In this appeal defendant asserts that the district court committed reversible error by denying two requests by defense counsel designed to assure the impartiality of the jury. He urges that the district court committed reversible error (1) by not interrogating the jurors individually *in camera* as to whether they had been exposed to any prejudicial publicity that occurred during the trial[1] and (2) by not sequestering the jury after they had begun deliberating on the night of November 20. We affirm.

Because defendant relies heavily on the facts of this particular trial to support his claims, we will describe the relevant events in some detail. The trial began on Monday, November 13. Before dismissing the jurors for the day, Judge Grady admonished them at length and in detail not to read, listen to or watch anything about the case in any of the media and not to discuss it with anyone.[2] The following day both the *Chicago Sun Times* and the *Chicago Tribune* reported the events at the trial. Both stories were factual, non-inflammatory and could have told the jurors nothing they did not already know.

On Tuesday, November 14, when the court reconvened defense counsel informed it that a plea agreement had been worked out with the Government. After a delay to have it typed, a lengthy and detailed plea agreement signed by the defendant, three Government counsel and three defense counsel was submitted to the court. In accord with Rule 11 of the Federal Rules of Criminal Procedure, the district judge proceeded to question the defendant in order to establish a factual basis for the plea. The defendant denied receiving some of the money acknowledged in the plea agreement, and while he admitted receiving the rest, he denied that he had demanded it or that he accepted it in exchange for taking certain actions in his official capacity. Judge Grady concluded that the defendant had refused to admit facts necessary to

---

* Hon. William J. Campbell, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. No claim is made regarding pretrial publicity.

2. Judge Grady's admonishment to the jury appears as item A in the Appendix to this opinion.

establish extortion, and he therefore refused to accept the plea. The extensive questioning preceding the rejection of the plea took place in open court but not in the presence of the jury. At the end of the interrogation the judge commented to defense counsel "[W]e have wasted—and I mean wasted—three hours" (Tr. 191). The court then called the jury in, admonished them not to read the newspapers, watch television or listen to the radio at all, and sent them to lunch.[3] After lunch the trial continued. When the jurors were excused for the day, the judge again strongly admonished them not to read, watch or listen to any media reports of the case or to discuss it with anyone.[4]

The following day the *Sun Times* and the *Tribune* carried a total of five stories relating to the defendant's unsuccessful attempt to plead guilty and the judge's comment about wasted time (R.65 ex. C–G).[5] That morning before the trial began the court held an *in camera* discussion with counsel regarding the possible exposure of the jurors to the publicity about the attempted plea. Defense counsel began to request *in camera* individual interrogation of the jurors, but the judge, relying on *Margoles v. United States*, 407 F.2d 727 (7th Cir. 1969), certiorari denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84, concluded that he would first question the jury collectively. "If any of them say they have read it or seen it, then we go in camera, but not in the event no one has read it or seen it" (Tr. 355). When the jurors were brought in, the judge carefully questioned them as to whether they had heard or seen anything about the case in any of the media or from any other source outside of the courtroom.[6] When none responded affirmatively, the trial was continued. When the jurors were excused for the day, they were again admonished as to the importance of avoiding publicity regarding the case.[7]

After the jury had been excused, defense counsel moved *in camera* for a mistrial based on the publicity about the aborted plea. The judge denied the motion, relying primarily on the jury's negative response to his interrogation.[8] Judge Grady gave as additional reasons for denying the motion the fact that the defendant had apparently intentionally brought the situation on himself[9] and his belief that in the context of

---

3. This admonishment appears as item B in the Appendix to this opinion.

4. This admonishment appears as item C in the Appendix to this opinion.

5. Coverage of the trial was also included in one of the televised newscasts the evening after the attempted guilty plea. This broadcast included pictures of a member of the defense team, but it is unclear whether any reference was made to the rejected plea (Tr. 353–354).

6. The questions put to the jury appear as item D in the Appendix to this opinion.

7. This admonishment appears as item E in the Appendix to this opinion.

8. In this regard, Judge Grady commented,
 "Well, I am going to deny the motion and I am going to state why. The most important thing of course is the negative response that we got from the jurors today in regard to their exposure to any publicity. I believe, as I said yesterday, that jurors do take those admonitions seriously and it is apparent to me that this jury has.
 "I think it is important to note that as conceded by both sides yesterday in an off-the-record conversation we had, this jury is exceptionally able in terms of its qualifications. We have more, I think, truly outstanding citizens on this panel of 14 than one normally sees on a jury panel. So I think that there is no reason to doubt the statements by the jurors today that they have not received any information other than that which they received in the trial." (Tr. 505.)

9. The court described the events surrounding the rejected guilty plea:
 "The second general basis for my ruling is that the defendant brought this on himself.
 * * * * * *
 "The plea agreement was * * * signed by three lawyers for the defense and it was signed by the defendant himself who is a lawyer. It was signed by three prosecutors and it was represented to the Court that this was the product of a long session in which the defendant had, himself, personally participated.
 "Now, we thereupon undertook to take this plea in open court, which under Rule 11 is the requirement in the absence of good cause shown. Certainly there was no good cause shown up to that point as to why we should have the proceeding in chambers * * *.

this case the defendant would not be prejudiced even if the jury had been exposed to the offending publicity.[10]

From that day until the following Tuesday, the day the guilty verdict was handed down, only one article regarding the trial appears in the record. That article, published on November 16, was an editorial in the *Chicago Tribune* entitled "Why did it take so long?" The editorial noted the attempted guilty plea and stated that the defendant had been publicly charged with official misconduct seventeen years earlier. It ended by questioning why prosecution had taken so long (R.65, ex. H). That day, and on Friday and Monday as well, the court began each session by interrogating the jury collectively as to whether any of them had read, seen or heard anything about the case (Tr. 532, 635, 869). The response was always negative.[11] At the end of the day on Thursday and Friday the jury was again carefully admonished to avoid publicity about the case (Tr. 615, 862).

> "Before anything specific was commented upon in terms of the offense, I asked Mr. Carter whether he had read the agreement, whether he understood it, whether he had signed it, whether he had indeed participated in its preparation, and whether it stated his understanding of the agreement and his answer on each score was in the affirmative. What happened thereafter is well known to all of us.
>
> "I believe that it is quite clear that Mr. Carter misled his own attorney, misled counsel for the government, and misled the Court. Had any of us had any idea whatsoever that Mr. Carter was going to back down from the clear and unequivocal admissions contained in the written plea agreement to which he had affixed his signature, we would not have attempted to take that plea in open court." (Tr. 507–509.)

**10.** The court's reasoning in this regard was that the evidence was so overwhelming against the defendant that if he chose not to testify, it was inconceivable that he would be acquitted. On the other hand if he did testify, presumably he would take in defense the same position that he had during the question over the guilty plea—that although he received some money, he had not extorted it. In this case, the judge reasoned, the defendant would not be prejudiced if the jurors read the same defense in the newspapers (Tr. 510–512). In fact, both the prosecutor and the court expressed concern lest through the aborted guilty plea the defendant

The trial concluded on Monday afternoon, and the jury began deliberating at 6:00 p. m. At about 9:35 p. m. the judge held an *in camera* conference with counsel for both sides to determine whether the jury should be sequestered. Defense counsel advocated sequestration on the ground that

> "There is a likelihood of more publicity at this point in time. * * * I think the chances of them remaining sanitized is [*sic*] much less at this point in time." (Tr. 1088.)

The prosecutor agreed to sequestration out of "an abundance of caution" (Tr. 1089). The judge, however, exercised his discretion in favor of not sequestering the jury.[12] He gave two reasons for doing so. First, addressing the issue of publicity, which was the only reason for sequestration advanced by the defense, he stated that he thought the risk of seriously prejudicial publicity was not great and that "so far they [the jurors] have abided by the Court's strictures

"may get his defense in without taking the stand." (Tr. 348–350.)

**11.** The defendant makes much of an interrupted remark by a juror on Thursday, November 16. After the court had asked if anyone had been exposed to publicity about the trial he concluded it by saying

> The Court: "If so, signify by raising your hand."
> A Juror: "If the—
> The Court: "If the answer is yes, raise your hand."

The defendant suggests that the juror may have been starting to admit to exposure to publicity, but was intimidated by the court's interruption. This is a far-fetched theory on which to base a reversal, especially when there was no objection at the time. Defense counsel on appeal assumes that neither the court nor the [different] trial counsel heard this remark, but it is at least as likely that they heard it and understood the judge's clarifying statement to be what the juror had sought. There is simply no basis for a contrary assumption.

**12.** He first offered a compromise proposal, suggesting that he tell the jurors that he would prefer for them not to separate but would allow them to do so if it would cause great and critical inconvenience (Tr. 1093). Defense counsel rejected that suggestion on the ground that the jury would probably elect to separate (Tr. 1095).

on that kind of thing * * * " (Tr. 1090). Later, he noted that the jury was not prepared for sequestration, and commented

"My interest is in insuring a fair trial to both sides and at the same time not doing anything that is terribly oppressive as far as the jury is concerned.

"The latter consideration is motivated not only out of concern for the jury but out of concern for the first consideration because if we discombobulate these jurors, they are not going to be able to view the thing with the same kind of concentration we would hope for under ideal conditions.

"So it seems to me that it is to everyone's advantage to have a jury that is not unstuck emotionally." (Tr. 1093.)

When the court reconvened the following morning, the jurors were again interrogated on whether they had been exposed to publicity about the trial. The response was negative. The guilty verdict on nine counts was returned later that day.[13] A post-trial motion for acquittal or a new trial, based on the assertedly erroneous denial of the motion for a mistrial because of the publicity about the attempt to plead guilty and the refusal to sequester the jury, was denied (R.65, 66). We affirm the judgment of conviction.

### The Court Was Not Required to Interrogate the Jurors Individually and In Camera.

The defendant concedes that the law of this Circuit, under *Margoles v. United States*, 407 F.2d 727 (7th Cir. 1969), is that "only when a juror indicates [after the judge questions the jury collectively] that he has been exposed to any of the publicity in question is the defendant entitled to an individual and *in camera* inquiry of that juror" (Br. 11). Indeed, the Government is correct when it characterizes the procedures set out in *Margoles* as well-settled. See *United States v. Battaglia*, 432 F.2d 1115, 1118 (7th Cir. 1970), certiorari denied, 401

U.S. 924, 91 S.Ct. 868, 869, 883, 27 L.Ed.2d 828; *United States v. Barrett*, 505 F.2d 1091, 1100 (7th Cir. 1975), certiorari denied, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450; *United States v. Akin*, 562 F.2d 459 (7th Cir. 1977), certiorari denied, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531. The Fifth Circuit summarily approved the collective interrogation procedure when the offending publicity, as here, consisted of reports that the defendant had entered and then withdrawn a guilty plea. *United States v. Khoury*, 539 F.2d 441 (5th Cir. 1976).

While he chose not to address this issue at all during oral argument, defense counsel in his brief urges that notwithstanding these precedents, the circumstances of this case made it reversible error not to interrogate the jurors individually. Although not clearly articulated, the argument appears to be twofold: (1) there was so much adverse publicity that it is inconceivable the jury was not influenced by it, and (2) in any event the specific collective interrogation procedure used here was unlikely to elicit admission by a juror that he had been exposed to outside influences.

The facts of this case do not support the contention that the publicity was so pervasive and hostile that prejudice should be presumed. The cases cited by defendant in this regard are plainly inapposite. Most of them involved sensational murder trials where the accused faced the death sentence and the media was saturated with virulently prejudicial publicity or with reports of the accused's confession. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. In all of these cases, it was conceded that the jurors had been exposed to the adverse publicity, and the only question was whether it was so prejudicial that it must be presumed that the jury could not put it out of their minds. See also *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3

---

**13.** One of the original thirteen counts had previously been dismissed by the Government. A mistrial was declared on the remaining three counts, which charged various specific acts of extortion.

L.Ed.2d 1250. In the present case, in contrast, the only real question regarding prejudicial publicity is whether the jury knew about the aborted guilty plea.[14]

■ We therefore turn to the adequacy of the procedures used to admonish and interrogate the jury. The defendant complains that these charges from the court were performed in a rote manner. A number of them are quoted at length in the Appendix to this opinion and they demonstrate that the court could hardly have been more conscientious. Next, the defendant suggests that the court was excessively paternalistic and that the jurors would be unlikely to admit in open court that they had disobeyed his instructions. There is no support for this hypothesis, which could be advanced any time a jury is interrogated collectively.[15] To accept it would effectively overrule *Margoles v. United States, supra,* which we decline to do.

■ Finally, the defendant seeks to distinguish this case from *Margoles, supra.* The fact that a specific defense request for individual juror interrogation was made here but not in *Margoles* is not dispositive. We have previously held that a collective inquiry may suffice even though an individual one was requested. *United States v. Akin, supra.* Furthermore, we see no basis to conclude that the publicity in this case

was significantly more prejudicial than that in *Margoles.*[16] The fact that in *Margoles* the court asked about specific news articles whereas here the inquiry was a general one does not strengthen defendant's case, especially when his attorneys had represented to the court that they were concerned about out-of-court discussions as well as media coverage. The judge was making a commendable attempt to be thorough.[17] We have approved such general inquiries before. *United States v. Barrett, supra.*

■ We note finally that contrary to defendant's contention, *Margoles* did not overrule any assertedly salutary rule established in *United States v. Accardo,* 298 F.2d 133 (7th Cir. 1962) requiring individual juror interrogation. The *Accardo* case turned on the inadequacy of the single admonition to the jury to avoid exposure to publicity about the trial, which was rendered only at the very beginning of the case. Although the majority opinion refers to the necessity for individual juror questioning, it is unclear whether the reference is to the inquiry about whether the jurors had been exposed to publicity or instead whether despite such exposure they could maintain their impartiality. In any event one judge dissented, finding the procedures used constitutionally adequate. The third judge concurred but made clear that individual juror questioning was not required. (298 F.2d at 140.)[18]

**14.** We will assume without deciding that knowledge of the attempted plea would have been prejudicial to the defendant. See note 10 *supra.*

**15.** This Court has previously approved a collective interrogation at least as "paternalistic" as the one complained of here. In *United States v. Barrett,* 505 F.2d 1091, 1100 (7th Cir. 1975), the district court questioned the jury as follows:

"First of all, ladies and gentlemen, last Friday I admonished you to conscientiously and purposefully avoid reading about anything over the weekend involving this case, or to listening to anything on radio or TV involving this case.

"Is there anyone on this jury that failed to comply with my request? If so, raise your hand."

**16.** In *Margoles* the publicity included testimony of a witness that had been ruled inadmissible by the court. See also *United States v.*

*Khoury,* 539 F.2d 441 (5th Cir. 1976) (collective inquiry to determine whether jury had read report of withdrawn guilty plea approved).

**17.** If the court had asked only about specific articles and broadcasts and it was later discovered that another one, unknown to the court, had also appeared, his failure to inquire about it would doubtless be the basis of another mistrial motion.

**18.** A district court could in an appropriate case engage in individual *in camera* interrogation of jurors even on the threshold question of whether they had been exposed to prejudicial publicity. However, because there has been no showing that the procedures set out in *Margoles* were likely to have been inadequate in this case, the court was not required to go beyond them. Moreover, such a procedure has drawbacks both in terms of delaying the trial and in possibly subjecting the jurors to additional tension that might cause them to be less likely to

*The District Court Did Not Abuse its Discretion by Allowing the Jury to Separate After Beginning its Deliberations.*

■ This Court held in *United States v. Arciniega,* 574 F.2d 931 (7th Cir. 1978) that it was within the district court's discretion to allow a jury to separate after it had begun deliberating. *Arciniega* expressly overruled the earlier rule in this Circuit that the defendant had a right to uninterrupted jury deliberations. *Arciniega* brought this Circuit into accord with most other circuits, which allow the district court in the exercise of its discretion to permit a deliberating jury to separate. *United States v. Johnson,* 584 F.2d 148, 154–155 (6th Cir. 1978); *United States v. Piancone,* 506 F.2d 748 (3d Cir. 1974); *United States v. Hill,* 496 F.2d 201, 203 (5th Cir. 1974). Although the circumstances of the *Arciniega* case were extraordinary,[19] this Court has since approved allowing the deliberating jury to separate when there was no special reason to permit them to do so. *United States v. Muscarella,* 585 F.2d 242 (7th Cir. 1978). Clearly there is no absolute rule that jury deliberations may not be interrupted.

■ The question becomes the scope of the district court's discretion to release the jury and whether that discretion was abused in this case. The defendant primarily argues that we should overrule the *Arciniega* rule that

"for separation to constitute reversible error there must be an objection supported by specific reasons against separation and a showing that the defendant was actually prejudiced by reason of the separation." (574 F.2d at 933.)

This we decline to do. Defendant appears to argue that it will be almost impossible for a defendant to demonstrate actual prejudice, and therefore that it should be reversible error any time a deliberating jury is allowed to separate over a defendant's objection. We cannot agree. The other circuits that have allowed the district courts to exercise their discretion in deciding whether or not to allow the jury to separate once deliberations have begun have not required the defendant to agree. *United States v. Johnson; United States v. Piancone; United States v. Hill,* all *supra.* As Judge Grady pointed out (quoted *supra*) it may well serve the interest of justice to have the jury separate and return refreshed the next day especially when, as here, the jurors were not told ahead of time that they might be sequestered.[20] While the defendant might be expected to look after his own interests and to agree to let the jury separate when that appeared advantageous to him, the prosecutor and the court also have an interest in assuring that the jury reaches a verdict free of extraneous pressures and discomfort. Also, of course, the jury should not be subjected to unnecessary strain.

■ We do not agree that it will be almost impossible for any defendant to demonstrate actual prejudice sufficient to justify a reversal under *Arciniega.* For example, if a juror in this case had been exposed to seriously prejudicial publicity overnight, this might have necessitated a mistrial.[21] For this reason it might have been the better course—and often will be the better course—for the district court to arrange ahead of time to sequester the jury.[22] However, this does not mean that the *Arciniega* rule need be limited to cases

acknowledge having been exposed to unauthorized information.

**19.** In *Arciniega* the marshall informed the court by telephone that a bomb threat that appeared to be serious had been received. Although neither the judge nor counsel for either party was present in court, we approved of the judge's decision to let the jury go home and reconvene in the morning.

**20.** It is not clear from the record whether it would have been possible to secure suitable

hotel accommodations at 9:45 p. m., when the decision not to sequester was made.

**21.** This type of danger may well have been what the prosecutor had in mind when he acquiesced in defense counsel's sequestration request "out of an abundance of caution."

**22.** Defendant suggests as an alternative that the judge could send the jury home after closing arguments and let them begin deliberating after being instructed the following morning. This might help to assure uninterrupted deliberations, but we have already determined that

in which the defendant does not object.[23] We are confident that district courts will be sensitive to preserving the integrity of the jury deliberations and will not casually allow deliberating juries to separate, particularly because if the defendant can show the likelihood of actual prejudice as a result of separation, he will be entitled to a mistrial. We note in addition, as did the district court, that in this case proof of guilt was overwhelming. Where the case is closer it might well be easier for the defendant to show prejudice.

 Defendant here has virtually conceded that he can show no such prejudice. The only potential prejudice he suggests is that of adverse publicity. However, we have already determined that the district court took adequate measures to admonish the jurors to avoid publicity and to interrogate them to determine whether they had been exposed to any. As we held in *United States v. Barrett, supra,* once appropriate procedures for admonishing and interrogating the jury have been followed, the court is entitled to conclude that the jury was not exposed to the potentially prejudicial publicity. We fail to see why procedures which were deemed adequate during the trial to assure an impartial jury became less so once that jury has begun to deliberate.[24]

The judgment is affirmed.

## APPENDIX

A. Admonishment of November 13, 1978:

"Let me say something that is very important. You should not read about this case in the newspapers. You should not listen to anything about it on the radio, and you should not watch or listen to anything about it on the television.

"I think it is safe to assume that reference to this case will be made in all three of those media from time to time during the course of the trial. It is absolutely essential that the only information that you get about this case comes from that witness stand. That is where the testimony is under oath. That is where it is subject to cross examination. That is where it is subject to rules governing the admission of evidence.

"I don't want your minds being affected in any way by anything that you get from any other source because we have no control over that. We don't know whether it is true or false. We don't know whether it is rumor. We don't know whether it is the wildest kind of misinformation.

"If you get anything out of any of those sources, the problem is that down the line when the case is all over, you will have very great difficulty remembering what you got where. One thing we do know is if the only place you get anything is right from the stand, then we don't have any problems. We know that every piece of information you have you got from a legitimate source.

"I don't mean to say that the newspapers or the press are illegitimate. It is just that they are not subject to the rules that govern the trial of lawsuits.

a defendant has no absolute right to uninterrupted deliberations. To the extent the problem is the danger of outside influences (media publicity or private discussions), we do not think this danger would be substantially mitigated by the fact that the jury was exposed to such influences the evening before it began deliberating rather than during a recess in its deliberations. On the facts of this case, it is substantially more likely that the jurors would have been exposed to such influences if they had been released after closing arguments (around 5:00 p. m.) rather than, as they were, at approximately 10:00 p. m.

**23.** There are two additional reasons not so to limit the *Arciniega* rule in the present case.

First, the argument that the defendant must agree to let the jury separate was not made to the district court. The only reason given against separation was the fear of publicity, which the district court determined could be controlled. Second, defense counsel rejected the compromise solution proposed by the court which might have resulted in the jury's remaining sequestered. See note 12, *supra.*

**24.** Defense counsel did not request any different procedures once the decision not to sequester was made. The district court admonished the jurors before excusing them and interrogated them collectively the following morning with its usual care.

"It will be necessary for me—and I will tell you in advance—it will be necessary for me to ask from time to time whether anyone has read anything or seen anything in the paper or heard it on TV. So there will be occasion for me to find out whether you are doing this.

"I am sure no one will deliberately disobey this injunction. The dangerous thing is that you might hear something or read something inadvertently. So be vigilant about what you read in the newspaper. If you see a headline in the paper or one of these short little headlines above an article that looks like it might pertain to this case, go on to something else. Turn the page. The same thing with the radio and the TV, if you catch a snatch of a beginning of an announcement that sounds like it might pertain to this case, walk out of the room, turn it off, because we don't want to have anything go wrong here.

"There is an awful lot of time and money and energy that is invested in this trial and in the process of keeping it fair. It is essential that we all cooperate toward that end.

"Don't discuss the case with anybody. When you go home tonight, if your husband or wife asks you what kind of a case it is, you can just say that it is a criminal case but don't discuss any of the details and keep your thoughts to yourselves." (Tr. 138–140.)

B. Admonishment of noon, November 14, 1978:

"Now, I must admonish you not to read the newspapers, not to watch television, and not to listen to the radio. In this instance I must ask you not simply to selectively avoid any article or item that might pertain to this case. I must insist that you not read the paper at all and I must insist that you not listen to the radio at all, nor watch television at all until further notice.

"Now, I mean this quite literally and I am not asking you anything that is not necessary. I am not being unreasonable simply for the sake of inconveniencing you." (Tr. 192–193.)

C. Admonishment at the close of court on November 14, 1978:

"Let me admonish you again not to read the newspapers between now and further notice from me. And I mean that literally, just don't read the newspapers. Don't let anybody talk to you about this case. If you get home tonight and somebody says, 'Let's talk about the case', just tell them, 'You don't want to hear about it. You don't want to talk about it.'

"I told you today, don't watch television or listen to the radio. You can watch television tonight but don't watch any news programs. If there is a program that you want to watch that is a regular show of some kind, you can go ahead and do that but please don't watch the 10 o'clock news or the 6 o'clock news or anything like that.

"The same with the radio. If you want to listen to FM music or something like that, go ahead; but don't listen to any newscasts.

"I have a very good reason for doing this. It is not simply an idle suggestion. I am just as certain as I sit here that there will be material about this case that you should not see or hear that will be on the media and that is why I am giving you this instruction and I mean it just as much as I can mean anything. So please do not violate this rule." (Tr. 335–336.)

D. Interrogation of jury on November 15, 1978:

"I would like to ask some questions. If any of your answers is yes to any of these questions, please so signify by raising your hand.

"First, has any of you read anything about this case in any newspaper since the trial started on Monday?

"Second, has any of you seen anything about this case on television since the trial started on Monday?

"Third, has any of you heard anything on the radio about this case since the trial started on Monday?

"Fourth and finally, has any of you received any information whatsoever about or pertaining to this case since the trial started on Monday other than what you heard here in this courtroom?

"All right, the record may show that all jurors have answered those four questions in the negative by not raising their hands.

"I might say that I am very pleased that we have got a good record of compliance with the Court's directive." (Tr. 361–362.)

E. Admonishment of November 15, 1978:

"Now, let me admonish you again not to read the newspapers, not to watch—and I mean any newspapers at all. Please do not watch any news program on television and do not listen to any news program on the radio.

"When this is all over with, I think you will feel—and regardless of how the case comes out. That has nothing to do with it—but I think you will all feel that you have rendered a worthwhile and very important public service by serving as jurors on this case. Public service sometimes involves sacrifice, and what I am asking you to do is to sacrifice that part of your normal life that is involved with the news." (Tr. 467–468.)

TONE, Circuit Judge, concurring.

Although I joined in the *Arciniega* opinion and have no doubt that case was correctly decided on its facts, I now think the rule we announced there, 574 F.2d at 933, goes too far by requiring a showing of actual prejudice. The time when the jury is deliberating is indeed "the most delicate time of all," as the United States Attorney said in stating his reasons for favoring sequestration in the case at bar. It is the time of greatest danger that a troubled juror may be tempted to seek outside information or even advice, and the serious impropriety of such an act makes it less likely that it will be disclosed later. That danger is increased when the trial is receiving media coverage that makes such outside information or advice readily available. The danger of jury tampering will also probably be greater at that point in the trial, especially if it becomes the general rule not to sequester jurors. Therefore, I think separation of the jury during deliberation should be the exception in criminal trials. With a little advance planning, either the necessity for overnight sequestration can be avoided or it can be carried out with a minimum of inconvenience to jurors.

The standard I would substitute for actual prejudice, absent exigent circumstances or a stipulation for separation, both of which were present in *Arciniega,* is serious risk of prejudice. This standard would recognize that actual prejudice is likely to be difficult to prove, since proof usually depends on a wrongdoer's admission; and it would have the prophylactic effect of requiring that a serious risk of prejudice be avoided.

The case before us is one in which allowing the jury to separate during deliberations carried with it a serious risk of prejudice. The defendant's aborted guilty plea had been covered in news stories and, in view of the media's interest in the trial, was likely to be reported again in recapitulation stories on submission of the case to the jury, as in fact it was.

The rule I propose is not the rule of this circuit at present, however. Given the present rule requiring actual prejudice, I concur in the result.

I also agree that the law as it now stands does not require jurors to be interrogated individually about their exposure to prejudicial publicity occurring during the course of the trial. When such publicity does occur, however, I believe the better way to assure that the jurors have not been exposed to it will usually be individual interrogation *in camera* followed by a report by the judge to counsel and the defendant.

I concur in the judgment for the reasons stated above.