**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Lloyd G. BERGERON, Defendant and Appellant.**

**Cr. No. 912.**

Supreme Court of North Dakota.

Oct. 31, 1983.

27–17–03, N.D.C.C.

J.E. Rick Brown, Asst. State's Atty., Grand Forks, for plaintiff and appellee.

Robert J. LaBine, Grand Forks, for defendant and appellant.

SAND, Justice.

This is an appeal by the defendant, Lloyd G. Bergeron (Bergeron), from a conviction for the manslaughter of Victor Brage (Brage).

At approximately 11:30 p.m. on 20 October 1981, Grand Forks police officer Kevin Kallinen received a call reporting that a partially clothed man was lying in the yard of 419 Cherry Street in Grand Forks. He responded to the call, and upon arrival found Brage lying on the sidewalk of 419 Cherry Street a few feet from the north door of the house. A second officer, Bryan Sieber, came to the scene shortly thereafter. Sieber testified that Brage was unconscious and that he was naked from the waist up. Brage was taken to the United Hospital in Grand Forks for treatment.

The police arrested Bergeron at 12:30 a.m. on 21 October 1981, and the Grand Forks County state's attorney's office charged him with aggravated assault. Sev-

en weeks later, on 7 December 1981, Brage died. The charge against Bergeron was changed to murder.

The principal witness against Bergeron at trial was Leona Thompson. Thompson, an alcoholic who was undergoing alcohol treatment at the time of trial, had been intimately involved with Bergeron in 1978. For several weeks prior to the assault, however, she was living with Brage and was with him on the evening of 20 October. Thompson testified that she and Brage had been visiting, drinking, and playing cards together that afternoon and evening. Thompson stated that Bergeron came to Brage's apartment about 9:00 p.m., called out for her about three times, and then said, "Brage, come out here." Neither Brage nor Thompson responded, and Bergeron apparently left. According to Thompson, Bergeron returned sometime after 11:00 p.m., entered the apartment through an unlocked door, pulled Brage from a kitchen chair, threw him on the floor and beat him. Bergeron then told Thompson to get her coat because he was going to call a cab to take them to the Forks Hotel.

At 11:12 p.m., Stanley Ofstedal, a cab driver for the Nodak Cab Co. in Grand Forks, answered a dispatcher's call to proceed to 419 Cherry Street. Ofstedal stated that he arrived at 419 Cherry Street about 11:15. According to Ofstedal, Bergeron exited the north door of 419 Cherry, kicked an object just outside the door, and then temporarily disappeared around the corner of the house. When Bergeron reappeared he was with Thompson and the two of them entered Ofstedal's cab. When the cab reached the Forks Hotel, Ofstedal testified that Bergeron told him that "You never saw me."

While inside the hotel Thompson stated that Bergeron slapped her, swore at her, and then left, telling her to stay at the hotel until he got back.

Meanwhile, William Mutcher, a neighbor who lived next door to Brage, discovered Brage's body on the lawn of 419 Cherry Street and called the police. Mutcher testified that Bergeron arrived at the scene by cab shortly after the ambulance had taken Brage to the hospital. According to Mutcher, Bergeron told him not to tell anybody that he had been back to Brage's apartment.

The State offered the testimony of several witnesses to establish an apparent motive for the assault. William Strate, a law clerk for the Grand Forks County state's attorney's office, testified that Bergeron had been in his office on the morning of 20 October 1981. Bergeron asked Strate to file a complaint against Brage because Brage had allegedly stolen some things from Myrtle Silverman, Brage's and Bergeron's landlord. Strate stated that when he asked Bergeron for details, Bergeron's story kept changing. When Strate suggested that Silverman file the complaint, Bergeron then claimed that the missing items were his. According to Strate, Bergeron appeared "agitated."

Wallace Johnson, a Grand Forks police officer, testified that Bergeron also came to the police department on 20 October and asked Johnson to arrest Brage. Bergeron gave no reason why he wanted Brage arrested. When Johnson refused to arrest Brage, Johnson testified that Bergeron angrily told him that "he [would] take care of Mr. Brage himself."

Stanley Ofstedal, the cab driver who drove Bergeron and Thompson from 419 Cherry to the Forks Hotel, stated that Bergeron told him that Brage had "slapped up" Thompson and that he (Bergeron) was going to "kick the shit out of [Brage]."

Lois Kraft, a longtime friend of Bergeron, testified that Bergeron called her on 20 October and said, in effect, that he was going to get Victor Brage, that Brage was a cop caller and that he would never call a cop on Bergeron again.

Bergeron testified in his own behalf to rebut the charges. Bergeron said that he believed it was Clarence Zelmer, Brage's neighbor, who committed the assault because Zelmer had also been romantically involved with Thompson. Bergeron claimed that he told Ofstedal and Mutcher

**54** ■         ■

to disregard his presence at 419 Cherry because the police had been harassing him and he was afraid that they would arrest him for the assault.

Bergeron also called Myrtle Silverman in an attempt to establish an alibi for his whereabouts on 20 October. Although Silverman stated that Bergeron was at her house visiting that evening, she acknowledged that he left about 11:00 p.m.

When he was admitted to the hospital, Brage was in a semicomatose condition. Dr. Joel Johnson, an emergency medical specialist at United Hospital, testified that Brage had swollen eyes, multiple injuries about his face and head, and several fractured ribs on one side of his chest. At 10:00 a.m. on 22 October Brage's blood pressure and pulse rose to "life-endangering levels" and he developed a very high fever. Six doctors, three from each side, testified regarding Brage's medical condition and cause of death. Although the doctors disagreed about the cause of Brage's acute event on 22 October, there was medical testimony that it was directly related to the fact that Brage was seriously injured on 20 October. Brage's condition improved slightly thereafter but he remained in what was basically a vegetative state until his death on 7 December 1981.

The pathologist who performed the autopsy upon Brage testified that the ultimate cause of death was a massive pulmonary embolus. A pulmonary embolus is a blood clot that travels with the bloodstream to the lungs eliminating the bloodstream's oxygen supply and ultimately causes death. The pathologist stated that several conditions can cause a pulmonary embolism but that Brage's injuries, surgery, hospitalization, and immobility "did play a role in [Brage's] death." Brage's supervising physician agreed with the pathologist's conclusion.

A jury found Bergeron guilty of the lesser included offense of manslaughter. The court subsequently sentenced Bergeron to ten years in the state penitentiary, and he appealed the conviction to this Court.

The defendant raised numerous issues in his brief, but during oral argument on appeal singled out the issues we will consider, discuss, and resolve.

■ The defendant argued that the trial court erred when it denied his motion for a judgment of acquittal pursuant to North Dakota Rules of Criminal Procedure 29(a) on the ground that the evidence was insufficient to support the conviction. In reviewing this we must consider the evidence in a light most favorable to the verdict. *State v. Sheldon,* 301 N.W.2d 604, 616 (N.D. 1980), *cert. denied,* 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 204 (1981).

The State called fourteen witnesses. One of them, Leona Thompson, was an eyewitness to the assault. Thompson identified Bergeron as the one who pulled Brage from a kitchen chair, threw him on the floor and beat him. Four witnesses testified that Bergeron was angry with Brage. One of them, Lois Kraft, stated that Bergeron told her that he intended "to get Brage." Stanley Ofstedahl placed Bergeron at the scene when he identified Bergeron as the one who exited the house about 11:15 to enter Ofstedal's cab. Bergeron's own alibi witness acknowledged that his presence at the scene was possible, if not probable.

The medical testimony was complex and lengthy. The transcript contains nearly 400 pages of testimony from several medical doctors. Although the testimony was perhaps technical to a lay person, we believe that it was sufficient to sustain a conclusion that the assault placed Brage's life in a drastically compromised position and that his death was a direct and proximate result of the assault.

Considering the evidence in a light most favorable to the verdict, we find the defendant's contention that the evidence was insufficient to support the conviction is without merit.

■ The defendant next argued that the trial court erred when it refused to give three requested jury instructions regarding proximate cause. Instructions are considered as a whole and if they correctly

advise the jury as to the law of the case they are sufficient although parts of them, standing alone, may be erroneous or insufficient. *State v. Hendrickson,* 240 N.W.2d 846, 852 (N.D.1976).

We have reviewed the instructions submitted to the jury[1] and the instructions requested by the defendant.[2] The instructions as a whole encompassed the theory of the State's case, the defendant's opposition to that theory, and the applicable law. Accordingly, the court did not err when it refused the defendant's requested instructions.

■ The defendant next argued that the trial court erred by interrupting defense counsel's summation and advice to the jury that if they were confused about any evidence they could request the court to have the court reporter read back the testimony in question. During defense counsel's summation the following exchange occurred between defense counsel and the court:

1. The court instruction to the jury regarding causation provided:
    "Causation may be found where the result would not have occurred but for the conduct of the accused operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the accused clearly insufficient."

2. Defendant's requested jury instruction No. 11 provided in part:
    "The assault promimately [*sic*] caused the pulmonary embolism which resulted in Victor Brage's death . . . ."
    In his brief the defendant substituted the word "approximately" for the word "promimately."
    Defendant's requested jury instruction No. 14 provided:
    "The medical testimony in this case indicated that there are many conditions which may predispose or cause a clot to form. The testimony also showed that several of these conditions were present in Victor Brage prior to the time of admission to the hospital and were unrelated to the reason for his admission to the hospital."
    "As a jury, you must find beyond a reasonable doubt that the bed rest which followed the alleged assault on Victor Brage was an actual contributing cause in the formation of the pulmonary embolism which caused his death.

Mr. LaBine [defense counsel] continuing: "If you're confused about that date when you're deliberating, if you're confused about any evidence, you can request the Court to allow you to have the court reporter read back portions of the testimony that confused you.

"THE COURT: Will counsel approach the bench.

"MR. LaBINE: I'll withdraw that statement.

"THE COURT: Counsel approach the bench.

"(Discussion off the record at the bench.)

"THE COURT: The suggestion from counsel that the jury can have the Court read back portions of the testimony is an improper suggestion because it is strictly against the Rules of Procedure in this state.

"You may proceed.

"MR. LaBINE: Thank you, Your Honor."

"If you find that because of the existence of other predisposing factors to clot formation in Victor Brage, such as congestive heart failure, lung disease, chronic and acute alcoholism with associated liver disease, recent surgery, and possible others, that you cannot say beyond a reasonable doubt that the bed rest stemming from the trauma was an actual contributing cause in the formation of the clot, then you must return a verdict of acquittal.

"Furthermore, if you feel that after his admission Victor Brage suffered a stroke unrelated to his head trauma, and this stroke proximately caused the pulmonary embolus to form, and you cannot say beyond a reasonable doubt that it was the head trauma rather than the stroke that caused the pulmonary embolus, then you must return a verdict of acquittal."
    Defendant's requested jury instruction No. 18 provided:
    "The medical testimony in this case indicated that there are many conditions and factors which may cause a pulmonary embolism. The evidence also indicated that many of these factors were present in Victor Brage. If you determine by the expert medical opinion evidence that the proximate cause of the pulmonary embolism which killed Victor Brage is speculative, you must return a verdict of acquittal as the State will not have maintained its burden of proof beyond a reasonable doubt."

Defendant argued that the admonishment was improper under NDCC § 29–22–05 which provides:

"After the jurors have retired for deliberation, if they desire to be informed on a point of law arising in the cause, or to have any testimony about which they are in doubt or disagreement read to them, they, upon their request, must be conducted into the courtroom by the officer who has them in custody. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the state's attorney and the defendant or his counsel, or after they have been called."

The issue before us at first glance may appear to be comparable to the complex, unsettled issue if or to what extent counsel may comment on jury instructions, the law of the case in final argument or summation to the jury. However, a more careful analysis reveals the existence of a substantial difference. The referred-to issue is basically a substantive matter pertaining to the law of the case, whereas the instant issue is primarily procedural, which is governed by NDCC § 29–22–05 supra. In the instant case, defendant's counsel did not comment on jury instructions or the law of the case which in some instances is specifically authorized by statute, e.g., NDCC § 9–10–07.

Section 29–22–05, NDCC, is not directed to counsel but to the judge who has the responsibility and authority to conduct and control the affairs of the court, including the general supervision of the jury. These are matters that are solely within the function and province of the court. If counsel was concerned that the jury should be advised regarding the reading of the testimony he should have requested the court to do so. Such a request would have been proper even after the colloquy between the court and counsel. The court could also make this a part of the regular jury instructions.

The record does not reflect what was said between the court and counsel, but from what appears on the record we get the impression that the court was concerned that counsel was overstepping his authority and invading the province of the court. The statement, "because it is against the rules of procedure in this state," may convey several thoughts: that counsel should not make such statement but all right for the court to make; or that the jury may not make such a request. From subsequent developments we believe the jury took the admonishment to mean that it was improper for counsel to make the suggestion because the jury in fact subsequently asked for and received exhibits.

Counsel must have recognized that his advice to the jury was improper because immediately, right after the court asked counsel to approach the bench, he stated, "I'll withdraw that statement." This is a clear indication that counsel recognized that he was wrong. Furthermore, the statement or admonishment by the court was precipitated by counsel, which presents the question: May counsel benefit from any error he brought about? The maxim of law found in NDCC § 31–11–05(8) stating "No one can take advantage of his own wrong" has application to this situation.

■ In support of his argument the defendant presented an affidavit by one of the jurors after the trial stating that the jury was confused about some of the testimony. This was also included in defendant's motion for a new trial. The affidavit stated that because of the admonishment the jurors were hesitant to ask the court for further instructions regarding the evidence. We find this contention to be without merit for two reasons. First, the record reflects that the jury asked the court for particular exhibits on at least one occasion. This indicates that the jury was not reluctant to ask the court for further information regarding the evidence. Second, we believe that the affidavit amounts to an impermissible attempt by a juror to impeach his or her verdict under North Dakota Rules of Evidence 606(b). Rule 606(b) provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything

upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, but a jury may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the verdict of the jury was arrived at by chance. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."

■ Rule 606(b), NDREv, prohibits testimony regarding certain conduct by the jurors which has no verifiable outward manifestations. As a matter of public policy, our judicial system could not tolerate the harassment and intimidation which could result if unrestrained post-trial inquisition of jurors were permitted. *State v. Sheldon, supra,* 301 N.W.2d at 615. Absent outward manifestations of a verdict arrived at by chance, extraneous prejudicial information, or improper outside influence, a juror will not be permitted to impeach a verdict. As we stated in *State v. Forrester,* 14 N.D. 335, 338, 103 N.W. 625, 626 (1905), allowing jurors to impeach their verdict

"... would subject [them] to constant annoyance by being called upon to state the occurrences of the jury room, which ought to be kept secret.... It would subject jurors to influences by corrupt parties in an effort to have them impair their verdict after they had ceased to act as jurors. Although injustice may at times result from thus holding verdicts solemnly rendered unassailable by affidavits of jurors ... as to their reasons for agreements, we deem it the better rule, and subject to less liability to injustice,

that a verdict actually rendered shall be conclusively deemed to be a verdict, and beyond impeachment by the declaration of a juror as to a mental condition existing when he agreed upon a verdict, or as to his reasons for so agreeing."

See also *Grenz v. Werre,* 129 N.W.2d 681, 693 (N.D.1964).

In this instance the jury was polled as to whether or not the verdict represented each juror's decision. Each member acknowledged that it did. The affidavit did not disclose any instance of misconduct which falls within one of the exceptions to Rule 606(b), NDREv. Thus, the trial court did not commit error and properly refused to consider the affidavit when it denied the defendant's motion for a new trial.

■ The defendant next argued that the trial court erred by denying his motion to sequester the jury during its deliberations. The jury began deliberating on 25 October 1982 at 9:05 p.m. At 1:25 a.m., 26 October, the defense moved that the jurors be allowed to recess and that they be sequestered at a hotel until the next morning. The record does not indicate that any preparations were made in advance to sequester the jury, such as having acquired the necessary number of rooms and having instructed the jurors to bring personal items with them. The court presumably was aware of this and weighed the possible consequences of the jurors not having their personal items and thus the court permitted the jurors to return to their homes and ordered that they resume deliberations at 11:00 a.m. The jurors were again permitted to go home on 26 October at 10:15 p.m. They were ordered to reappear at 9:00 a.m. the next day, 27 October, the day the verdict was rendered.

The defendant relied heavily upon NDCC § 29–22–02 [3] and *State v. Lamoreaux,* 241

---

3. NDCC § 29–22–02 provides in part:
   "The jurors shall retire in charge of one or more officers who must be sworn to keep them together in some private and convenient place until they have rendered their verdict. Such officer or officers shall furnish food and other necessaries to the jurors ... and shall not speak to nor communicate with such jurors or any of them not permit any other person so to do except by order of the

N.W. 595 (N.D.1932), to support his contention that the court erred when it refused to sequester the jury. In *Lamoreaux* the Court applied a 1913 statute[4] similar to § 29–22–02 to an instance in which the court dismissed the jury overnight because of inclement weather. The Court held that separation of jurors after the case was submitted was an irregularity, but if the evidence affirmatively showed that no improper influences were used or attempted and that no prejudice could have resulted therefrom the irregularity did not entitle the defendant to a new trial. *Lamoreaux, supra* at 595. See also *State v. Julson,* 202 N.W.2d 145, 155 (N.D.1972). Although we concluded that the earlier statute did not contemplate the separation permitted in *Lamoreaux, Lamoreaux* is not dispositive of the instant case. The statute applied in *Lamoreaux* and NDCC § 29–22–02, although similar, are not the same. Furthermore, we note that the *Lamoreaux* decision was three to two. The dissenting opinion expressed the view that a defendant must show prejudice caused by a failure to sequester the jury regardless of how long they were separated. We believe that the dissenting opinion merits further consideration in light of the facts in this case.

The effect of jury sequestration can be a double-edged sword and the courts are in disagreement on this issue. *Compare State v. Williams,* 285 N.W.2d 248 (Iowa 1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980); *People v. Ritzert,* 17 Ill.App.3d 791, 308 N.E.2d 636 (Ill.App.Ct. 1974).

Although jury sequestration is provided for by statute and may be advantageous to a defendant, in some instances sequestration may also induce a jury to reach a premature verdict in order to end lengthy deliberations in uncomfortable situations. In some instances the interests of justice will be served to permit a jury to separate and return refreshed the next day, particularly when, as here, the jurors were not forewarned that they might be sequestered. Furthermore, the court may have justifiably reasoned that availability of rooms at that hour was doubtful, if not impossible. A defendant in some instances might wish to waive jury sequestration to prevent the jury from becoming uptight and uncomfortable if that appeared advantageous; however, the State and the court, independently, have an interest and obligation to assure that the jury reaches a verdict free of extraneous pressures, strain, or discomfort. *United States v. Carter,* 602 F.2d 799, 805 (7th Cir.1979), *cert. denied,* 444 U.S. 967, 100 S.Ct. 457, 62 L.Ed.2d 380 (1979). Furthermore, the number of citizens willing to serve as jurors may be greatly reduced if they became aware that a trial could be lengthy and that sequestration will always be mandatory. The federal courts leave the sequestration issue as a matter within the discretion of the court. *Carter, supra.*

The state of Nebraska has a sequestration statute[5] similar to that of North Dako-

---

court. Men and women jurors may retire, when rest or sleep or propriety requires it, to separate rooms."

4. The statute applied in *Lamoreaux* was § 10857, N.D.Comp.Laws 1913. Section 10857 provided:
    "The jurors sworn to try a criminal action may, at any time before the cause is submitted to the jury, in the discretion of the court, be permitted to separate, or be kept in charge of proper officers. The officers must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to or communicate with them, nor to do so themselves, on any subject connected with the trial, and to return them into the court at the next meeting thereof."

The current statute, to a great degree, is the product of the 1943 code revision which rearranged many of the 1913 compiled laws on the same subject.

5. The Nebraska statute provides:
    "When a case is finally submitted to the jury, they must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court. The officer having them in charge shall not suffer any communication to be made to them, or make any himself, except to ask them whether they have agreed upon a verdict, unless by order of the court; nor shall he communicate to anyone, before the verdict is delivered, any matter in relation to the state of their deliber-

ta. In *State v. Robbins,* 287 N.W.2d 55 (Neb.1980), the Nebraska Supreme Court addressed a similar claim that the trial court erred when it permitted the jury to separate after the jury began deliberating. The court stated:

"Most courts which have considered the issue have held that a failure to comply with the terms of a mandatory sequestration statute, unconsented to by the parties, does not in and of itself constitute reversible error. The critical issue in such cases is whether harm or prejudice has been caused to the defendant by the failure to comply with the statute." *Robbins, supra* 287 N.W.2d at 58.

The Nebraska court further held that a failure to comply with the statute created a rebuttable presumption of prejudice and that the burden of showing that no injury resulted rested upon the State. To prove or establish a negative is truly difficult. We decline to adopt such a presumption.

An argument can be made that, absent a presumption of prejudice, the defendant may have difficulty to establish sufficient prejudice to require a new trial. We do not agree. For example, if a juror was exposed to the significant prejudicial publicity during a separation this could be grounds for a new trial. For this reason the trial court should prepare to sequester the jury in advance whenever a lengthy trial is anticipated. However, mere reliance upon NDCC § 29–22–02 without a showing of actual prejudice is insufficient.

For separation to constitute reversible error there must be an objection supported by an affirmative showing that the defendant was prejudiced because of the separation. See *United States v. Arciniega,* 574 F.2d 931, 933 (7th Cir.1978), *cert. denied,* 437 U.S. 908, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978).

See also *Cardarella v. United States,* 375 F.2d 222 (8th Cir.1967), *cert. denied,* 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176 (1967); *State v. Robbins, supra.*

In this case the defendant was unable to identify any specific instance of prejudicial conduct. No affidavits were submitted to that effect and no such claims were made during oral argument to this Court. In this respect we take note that a juror's affidavit was presented in an effort to impeach the verdict. If prejudicial conduct existed, an affidavit alleging this would have been no more difficult to obtain than an affidavit impeaching the verdict. Furthermore, we note that the trial judge made over forty admonitions to the jury to avoid publicity and to avoid discussing the case among themselves. Once appropriate admonitions have been given this Court is entitled to conclude that the jury was not exposed to prejudicial publicity. Absent a showing of actual prejudice "we fail to see why procedures ... deemed adequate during the trial to assure an impartial jury became less so once that jury has begun to deliberate." *United States v. Carter,* 602 F.2d 799, 806 (7th Cir.1979), *cert. denied,* 444 U.S. 967, 100 S.Ct. 457, 62 L.Ed.2d 380 (1979).

Considering the circumstances of this case and the failure to show prejudice, we conclude that the trial court did not commit error in denying defendant's motion to sequester the jury.

The defendant, in his brief, also contended that the court erred when it denied his motions to (1) allow the jury to view the premises; (2) use a blackboard during voir dire; (3) receive a daily transcript of the proceedings; (4) interrupt the state's case to admit a map of the premises into evidence; (5) admit testimony of two purported experts, one in nocturnal light measurement, and one in alcohol counseling; (6)

ations. If the jury are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with or suffer themselves to be addressed by any other person on the subject of the trial, nor to listen to any conversation on the subject; and it is their duty not to form or express an opinion thereon until the cause is finally submitted to them." Neb.Rev.Stat. § 29–2022 (1943).

omit manslaughter and aggravated assault from the jury instructions as lesser included offenses of murder; (7) admit evidence of the criminal records of two State witnesses; (8) compel the appearance of a witness who answered defense interrogatories but who was recovering from a heart attack; and (9) suppress testimony of three witnesses the defense had actual or constructive notice would testify because the State did not provide written notice pursuant to Rule 12.-1, NDRCrimP, of their intent to testify.

■ As we have earlier stated, this Court need only address those issues on appeal that are controlling. *State v. Kouba,* 319 N.W.2d 161, 162 (N.D.1982). The requirement that we identify and discuss every point fairly raised by the record is no longer a part of the Constitution. *Nodland v. Nokota Co.,* 314 N.W.2d 89, 93 (N.D.1981). *Compare* N.D. Const. art. VI, § 5; N.D. Const. art. IV, § 101 (repealed 1976). Nevertheless, in *State v. Skjonsby,* 319 N.W.2d 764, 772 (N.D.1982), we addressed about thirty issues raised by the appellant to illustrate, in part, that the quality and the reasons in support of alleged error, rather than the quantity, controls in determining if a conviction should be reversed. We believe that that illustration was, or should have been, sufficient.

In *Jones v. Barnes,* —— U.S. ——, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the Court succinctly expressed the dangers inherent in raising a myriad of issues on appeal. Reversing a decision by the Court of Appeals for the Second Circuit, which held that a court-appointed defense counsel has a constitutional duty to raise every nonfrivolous issue requested by a defendant on appeal, the Court stated:

> "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Justice Jackson, after observing appellate advocates for many years, stated:
>
> > 'One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one. . . . [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.' Jackson, *Advocacy Before the Supreme Court,* 25 Temple L.Q. 115, 119 (1951).
>
> Justice Jackson's observation echoes the advice of countless advocates before him and since. An authoritative work on appellate practice observes:
>
> > 'Most cases present only one, two, or three significant questions. . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones.' R. Stern, Appellate Practice in the United States 266 (1981).
>
> "There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. This has assumed a greater importance in an era when oral argument is strictly limited in most courts. . . . A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." *Jones, supra,* —— U.S. at ——, 103 S.Ct. at 3313, 77 L.Ed.2d at 994.

Counsel, during oral argument, did not discuss the aforementioned nine issues. Nevertheless, we reviewed the record with respect to these issues and conclude that they are without merit and do not warrant discussion.

The judgment of conviction is affirmed.

ERICKSTAD, C.J., and PEDERSON, VANDE WALLE and PAULSON *, JJ., concur.

---

* Justice WM. L. PAULSON, served as a Surrogate Justice for this case pursuant to Section

27–17–03, N.D.C.C.